STATE OF KANSAS *ex. rel.* EDMUND G. ROSS *vs.* JOHN W. ROBINSON, Secretary of State, *et al., respondent.*

*Motion for writ of Mandamus.*

Section third of the act of May 15th, 1861, to provide for the state printing, imperatively requires that the general laws, the local laws, and such joint resolutions as the legislature might require to be printed with the laws, should be let in one contract, and the published proposal (*No.* 4,) called for bids for one contract for printing these three classes of matter, and prescribed the manner of the execution of the work.

*Held,* that a bid proposing "to print the general and local laws for the second session of the legislature, as follows per proposal number four," &c., omitting to mention the joint resolutions, may be disregarded as not responsive to ·the proposal, and as not binding the bidder to do all the work named in the published proposal.

The words "per proposal, number four," *construed* to relate to the manner of executing the work, and not to include the joint resolutions.

The law imposes on the state officers, in determining which bid should be accepted, a discretion which the courts have no power to control.

Mandamus will not lie to compel a public officer to do an official act unless the act be ministerial, and not discretionary.

The relator by petition showed that defendants, Robinson, secretary of state, Hillyer, auditor, and Dutton, treasurer of the state of Kansas, as the board of state officers autohrized by an act of the legislature entitled "an act to provide for the state printing," approved May 15th, 1861, to let the state printing, did, during the first week in November, 1861, give notice in four different newspapers, printed in different sections of the state, for sealed proposals for the state printing, as specified and in the manner pointed out in said act, that on the 9th day of December, 1861, relator filed his sealed proposal in the office of the secretary of state, indorsed "proposal for state printing," to print the local and general laws for the

second session of the legislature of Kansas, 1862, in words as follows :

"TOPEKA, December 9th, 1862.

"I propose to print the general and local laws for the second session of the legislature as follows, as per proposal number four. Composition per one thousand ems, two dollars. Press work per quire, twenty-five cents. Paper per quire, one dollar. E. G. Ross."

And that said proposal among others, was opened on the 11th day of December, 1862, by said Dutton, treasurer, and D. H. Weir, clerk of said John W. Robinson, secretary of state, and that the contract for the said proposal number four was then and there awarded to J. H. Bennett, of which award Bennett had notice then and there also.

And that on the 23d day of December, 1861, Bennett executed a bond to the state of Kansas, in the sum of three thousand dollars with W. P. Douthitt, J. P. Greer, and J. F. Cummings as sureties, conditioned for the faithful performance of the said printing mentioned in said proposal number four.

The bond was approved by Weir, as the clerk of Robinson, on the 23d December, 1861, but that the said bond was not filed in the office of the secretary of state until the 24th of March, 1862, which filing of said bond was more than ten days after the date that he received notice that the contract had been awarded to him, (Bennett.)

The relator shows that he was the next lowest bidder for said printing, mentioned in said proposal number four, and that he (Ross) did, on the 22d day of March, 1862, demand the award of the said contract for the said printing mentioned in said proposal number four, to him (Ross) of the said Robinson, Hillyer and Dutton.

And on the same day filed his bond in the office of the secretary of state, with good and ample securities, conditioned for the faithful performance of said printing. But that Robinson, Hillyer, and Dutton, refused to award him the contract or deliver him copy, in violation of said act as aforesaid.

The defendants answer by way of return to the alternative writ, and admit that they gave the said notice in pursuance of said act; that said Bennett received the award of the said contract for the said printing, as mentioned in said proposal number four. They further admit that Bennett, then and there had notice, as the relator shows.

They further admit, that the relator, (Ross,) filed his bid as per proposal number four, in the office of the secretary of state, on the 9th day of December, 1861; that he was the "next lowest bidder" for the said printing. They do not deny a single allegation of the relator, except in relation to Bennett's bond.

As to the approving and filing of said bond, the defendants answer:

"That immediately on his receiving said notice, the said Bennett filed his three several bonds with good and sufficient securities, copies of which are hereunto attached, marked exhibit 'C,' 'D,' and 'E,' in the office of the secretary of state, of said state of Kansas, for the faithful performance of his said bid, which said bonds were duly approved."

By way of new matter in bar the defendants set up that:

"Afterwards, to wit: During the session of the legislature of the said state, holden in the year A. D. 1862, there was a committe on printing, appointed by said legislature to look into the contracts and bids of the various parties who had offered to do the printing for said state, for the year as aforesaid, among them the bids of said E. G. Ross, and the said J. H. Bennett; that said committee took such action as to cause said J. H. Bennett to amend his said bid by deducting from the original bid some amount, but the precise amount is to these defendants now unknown; a copy of which amended bid is hereto attached, marked exhibit 'A.' And that afterwards, to wit: On the 5th day of March, A, D. 1862, the said Bennett printed and exhibited to said printing committee, appointed as aforesaid, the said amended bid; and that after-

State of Kansas *ex. rel.* Ross *v.* Robinson and others.

terwards, to wit: On the 5th day of March, A. D. 1862, the legislature, at its session, holden as aforesaid, by a concurrent resolution of that date, a copy of which is hereto attached, marked exhibit 'B,' authorized and empowered the said defendants to complete the contract with J. H. Bennett, for that portion of the public printing awarded to him, as aforesaid, which said public printing these defendants aver, is part and parcel of that for which said E. G. Ross claims to have bid in his said bill, mentioned as such bid. That afterwards, to wit: On the 21st of March, A. D. 1862, and in pursuance of the aforesaid notice to said Bennett, and in pursuance of said concurrent resolution, said defendants entered into three several contracts with said J. H. Bennett, copies of which are hereto attached, and marked exhibits 'F,' 'G' and 'H,' for the printing, binding, folding and stitching of the public documents, as aforesaid, which said contracts were duly filed in the office of the secretary of state, on the 24th day of March, A. D, 1862, and in pursuance of said contracts, award of said defendants to said Bennett, bonds and concurrent resolution, said defendants placed in the hands of said Bennett, all copies, papers and documents, appertaining to the office of state printer, and necessary for the speedy and proper binding and printing, as contemplated by the laws of the said state of Kansas. That said Bennett, as these defendants are informed, and verily believe, has now nearly completed said contract, as entered into as aforesaid. That said copies have been placed in the hands of said Bennett, at various dates and times since the passage of said concurrent resolution. And these respondents further say, and aver, that the said J. H. Bennett, to whom said public printing was awarded, as aforesaid, was never, nor has he ever been in default in any particular, at any time failed or refused to comply with all and singular the matters and things required of him by law, to be done in and about the said bid, bonds, contracts and public printing. And that the said relator, Edmund G.

Ross, is not now, nor has he ever been, entitled to that portion of the public printing, for which he claims said writ of mandamus should issue  *   *   *."

To this answer of the defendants, the plaintiff filed exceptions in the nature of a demurrer, as follows:

First. The answer of the said defendants does not disclose what the original bid of J. H. Bennett was, or that said Bennet ever filed a bid in accordance with the act specified in the relator's petition. The bid itself, together with the date of its filing in the secretary of state's office, should have been set out, so as to enable the court to determine whether such a bid was ever made or not; and if made, that it enabled the said J. H. Bennett to take the contract in the first instance. The answer is also defective, for not being responsive to the relator's petition, in this particular.

Second. The defendants' answer does not show that any bid was made by Bennett, for the said state printing, specified in relator's petition, for the year 1862, as called for in said proposal number four, specified in the relator's petition, or that Bennett ever made bids for doing any state printing, whatever.

Third. The defendants' answer does not show that any *award* was ever made to Bennett.

Fourth. The defendants do not show that a bond was given by Bennett, as required by law, for the performance of *the identical printing*, advertised for by the defendants in said proposal number four. It does not show that *a bond* was filed, in pursuance of *an award* of the printing mentioned in said proposal number four. Neither does it show what *was* the *approval* of the bonds, or by whom the approval was made; and the answer nowhere shows the precise date of the filing of the bonds; to whom they were delivered, or that the bonds were made "payable to the state of Kansas."

The answer does not show *which* of the bonds, referred to in the exhibits, was given for the performance of the printing

State of Kansas *ex. rel.* Ross *v.* Robinson and others.

specified in said proposal number four. The exhibits themselves, referred to in the defendants' answer, are not evidence, not being the original, nor copies of the original, under the great seal of the state.

Fifth. That so much of the defendants' answer as relates to the petition of the relator, is not responsive to each or all the allegations thereof, and is insufficient in law to bar the relator's right to a peremptory writ.

Sixth. That portion of the defendants' answer which sets up new matter, discloses nothing that will bar the relator's right to the peremptory writ. The rights of the relator were vested, as appears from his petition, before the session of the legislature of Kansas, on the 14th day of January, A. D. 1862, and over which said rights the legislature had no power whatever.

Seventh. The defendants' answer says:

"During the session of the legislature of the state, holden in the year 1862, there was a committee on printing appointed by said legislature to look into the contracts and bids of the various parties who had offered to do the printing for said state, for the year as aforesaid, and among them the bids of the said E. G. Ross and the said J. H. Bennett. That said committee took such action as to cause said Bennett to amend his said bid, deducting from his original bid some amount, but the precise amount is to the defendants *now* unknown."

The answer does not disclose of *whom* said committee was composed, what its powers were, what action it took, or that said committee ever made a report to the legislature, or either branch thereof, or that the acts of said committee were ratified in any form whatever.

Eighth. The answer of the defendants show that the said J. H. Bennett withdrew his original bid, if any he made, from the office of the secretary of state; amended the same by changing its terms as to the price of compensation for the said printing, and on the 5th day of March, A. D. 1862, "the

said Bennett presented and exhibted to said printing committee the said amended bid," "and that afterwards, to wit: On the 5th day of March, 1862, the legislature at its session holden as aforesaid, by a concurrent resolution of that date, authorized and empowered the said defendants to complete the contract with J. H. Bennett, for that portion of the public printing awarded to him as aforesaid, which said public printing these defendants aver is part and parcel of that for which said E. G. Ross claims to have bid in his said bill mentioned as such bid," all of which the said plaintiff avers is insufficient in law to bar the relator's right to the relief he prays for.

Ninth. The answer of said defendants does not show that the said Bennett's amended bid was the lowest, or that it was made in the manner provided in the said "act to provide for the state printing,," approved May 15th, 1861, or that the bid, as amended, was made in the manner "prescribed by law."

Tenth. The answer shows that on the 21st day of March, 1862, and in pursuance of the aforesaid *notice* to said Bennett, and in pursuance of said concurrent resolution, (number nineteen,) said defendants entered into "three separate contracts with said J. H. Bennett" "for the printing, binding and stitching of the *public documents, as aforesaid,* which said contracts were duly filed in the office of the secretary of state, on the 24th day of March, A. D. 1862," all of which the plaintiff avers is insufficient in law, and no bar to the relator's right to the relief prayed for.

Eleventh. The answer does not show that the said defendants have delivered any of the copies "of the general and local laws, and such joint resolutions as may be directed by the legislature to be printed therewith," to the said J. H. Bennett, as called for in said proposal number four, and bid for by the said relator.

The relator shows that the award to Bennett of the contract for the printing, specified in proposal number four, was made by Dutton and Weir, on the 11th of December, 1861, and that Bennett had notice on the same day of the said award to him.

The bond of Bennett, set forth in exhibit "E" of the defendants' answer, shows that it was not *executed* until the 23d of December, 1861, and the approval of Weir, as the secretary of state's clerk, was also of the 23d day of December, 1861, which is sufficient in law 'to bar the relator's right to the relief prayed for.

Twelfth. Exhibit "A," attached to defendants' answer, purporting to be concurrent resolution number nineteen, is no evidence of the existence or passage of such by the legislature, it being certified as "a copy" of concurrent resolution nineteen, by the officers of both branches of the legislature.

Thirteenth. The defendants' answer is both equivocal and alternative in this. They set up Bennett's original bid, notice and bond, and then, in the same cause of defense, plead the new matter in bar, viz.: The action of the legislature, the *amended bid*, the action of the printing committee, concurrent resolution number nineteen, and the agreement of Bennett with the defendants, Robinson, Hillyer and Dutton, made on the 21st of March, 1862, all of which are inconsistent, and is no bar to the relief prayed for by the relator.

*Shannon, Gilchrist and Williams,* for relator.

Section four of article fifteen of the constitution of the state of Kansas, provides :.

"All public printing shall be let on contract, to the lowest responsible bidder, by such executive officers, and in such manner as shall be prescribed by law."

Section eleven of "an act to provide for the state printing," (*Laws* 1861, *p.* 233,) provides :

" It shall be the duty of the secretary of state to give immediate notice to the successful bidder, that his proposals have been accepted; and each successful bidder (except the successful bidder for the printing for which proposals are to be called for immediately upon the publication of this act, who shall give such bond within two days after receiving such notice) shall, within ten days after receiving such notice, enter into bonds, payable to the state of Kansas, in the sum of not less than two thousand dollars nor more than five thousand dollars, for each and every branch of the public printing so awarded to him, with at least two sufficient and approved sureties, conditioned for the faithful performance, pursuant to this act, of that branch or branches of the printing to which he has been adjudged the successful bidder; and if he shall fail so to give bond within the time allowed, then the contract shall be given to the next lowest bidder, who will give bond as aforesaid."

Section two of the same act provides:

* * * * " And in such notice as is prescribed in this act, the secretary, auditor and treasurer shall publish an abstract of this law, stating distinctly each item to be bid for, the character of the work, and the mode of allowing compensation for the same, and the said secretary, auditor and treasurer, or any two of them, shall, within two days after the expiration of such notice, proceed to open all such proposals by them received." * * *

Sections twelve, thirteen and fourteen of an " act defining the powers of certain state officers," (*Laws of* 1861, *p*. 210,) provide:

" SEC. 12. Third. He (the secretary of state) shall have the custody of all books, records, deeds, bonds, parchments, maps, papers and other articles and effects belonging to the state deposited or kept in his office, and shall, from time to time, make such provisions for the arrangement and preservation thereof as shall be necessary; and the same, together

with all accounts and transactions of his office, shall be open at all times to the inspection and examination of the governor, or any committee of either or both houses of the legislature.

" SEC. 13. All deeds, conveyances, leases, bonds, mortgages and other securities for money, belonging to this state, shall, unless otherwise specifically directed, be deposited and preserved in the office of the secretary of state, and open to public inspection.

"SEC. 14. The secretary of state shall have power to appoint a clerk, and require from him such bond as he shall deem proper, and for whose acts the secretary shall be responsible."

" Fifth. He (the secretary of state) shall, when required by any person or persons so to do, make out a copy of any law, resolution, deed, bond, record, document or paper deposited or kept, and shall attach thereto his certificate, under the great seal of the state, and such copy, *thus certified*, shall, in all cases, be evidence equally and in like manner as the original." * * *

I. The duties of every ministerial officer are absolute, certain and imperative. Although an officer may not, in strictness, be a judge, still, if his powers be discretionary, to be exerted or withheld, according to his own view of what is necessary and proper, they are in their nature judicial. Duties which are purely judicial in their nature, are sometimes cast upon officers whose chief functions are ministerial. Judicial and ministerial functions, in the same officer, are not incompatible.

The secretary of state, so far as his duties relate to advertising for the state printing, in connection with the other members of the board, receiving the proposals, opening them, and awarding the contracts thereon, *acts ministerially*, because his duties are prescribed by law. (2 *Bouvier's Law Dict.*, 259, [6]; *Vose vs. Deane et al.*, 7 *Mass.*, 280; 5 *Wend.*, 170,

180; *Arnold vs. Stevens & Frost,* 10 *Wend.,* 515; *Wilson vs. The Mayor &c.,* of the City of New York, 1 *Denio,* 595; *The People ex. rel. Bush & Higby vs. Collins,* 6 *John.,* 549; 20 *Pickering R.,* 496-7-8.)

The duties of all ministerial officers may be discharged by deputies or clerks. (2 *Bouvier's Law Dict.,* 259, [6,]; *The State of New York vs. City of Baffalo,* 2 *Hill,* 434; 1 *Tomlin's Law Dict.,* 542, *Tit. Duputy*; 7 *Bac. Abr. Tit. Officer and Officers, L.; Earl of Shrewsberry's case,* 9 *Co.,* 48, 49; *Wilson vs. the Mayor of New York,* 1 *Denio,* 595; 1 *Bouv. Law Dict.,* 409, *Deputy,* 2, 4; *Comyn's Digest, Tit. Officer, D.* 1.)

The acts of D. H. Weir, as the lawfully constituted clerk of the secretary of state, (Robinson,) are valid, so far as they relate to performing the *ministerial* duties of the secretary of state. (*Kansas Laws,* 1861, § 14; 7 *Bac. Abr., Tit. Officer and Officers, L.; The State of New York vs. City of Buffalo,* 2 *Hill,* 434; 1 *Bouvier's Law Dict.,* 409, *Deputy,* 2, 4; *Comyn's Digest, Tit. Officer, D.* 1.; 20 *Pickering,* 496, 497, 598.)

The acts of D. H. Weir, as clerk of the secretary of state, and Dutton, in opening the proposals for printing, received at the office of the secretary of state, in awarding the contracts to the bidders, giving notice to the successful bidders that the contracts had been awarded to them, *were ministerial, and therefore valid.*

The award of the contract " for the printing of the general and local laws, and such joint resolutions as may be directed by the legislature to be printed therewith," as per proposal number four, of the board's notice, made by Weir and Dutton, on the 11th of December, 1861, to J. H. Bennett, was valid. (*Kansas Laws,* 1861, *p.* 211, § 14; *Kansas Laws,* 1861, *p.* 230, § 2, *last clause of the section before the proviso;* 1 *Bouvier's Law Dic., p.* 235, *Clerk Officer;* 1 *Boavier's Law Dic.,*

State of Kansas *ex. rel.* Ross *v.* Robinson and others.

*p.* 409, *Deputy,* 2, 4; 2 *Bouvier's Law Dic., Tit. Officer;* 10 *Wis.,* 533.)

The ministerial acts of Weir and Dutton, as a majority of the board to let the state printing, were valid, and if Bennett suffered any laches, the rights of third persons cannot be prejudiced thereby. Bennett had notice of the award of the contract for the state printing, as per proposal number four, on the 11th day of December, 1861. Section eleven of the "act to provide for the state printing," (*Laws* 1861, *p.* 223,) required Bennett, within ten days after receiving such notice, to enter into a bond, payable to the state of Kansas, for not less than two, nor more than five thousand dollars, with at least two *sufficient and approved* sureties, conditioned for the faithful performance of the contract so awarded to him.

The bond of Bennett was not *executed, even,* until the 23d of December, 1861, twelve days after the notice was given that the contract had been awarded to him. Here Bennett slept upon his right for two entire days, before he even attempted to execute a bond. (*See exhibit "E," attached to defendants' answer; the date of the making of the bond is the* 23d *of December,* 1861.)

There is not a single scratch of the pen, or even a word or figure in or on the bond, to show that it was *ever* filed in the office of the secretary of state, or that it had ever been in his office for filing; and the defendants have made no showing to justify a *legal* conclusion that it was ever filed there at all, or ever delivered to the secretary of state, or to any person for the secretary, previous to the 24th of March, 1862; and there is no evidence of any kind to show that it had been in the possession of any state officer previous to that date.

A bond, like a deed, takes effect from the *date of its delivery.* (7 *Bac. Abr., Tit. Obligation,* [*C,*]; 4 *Kent Com.,* 499, *et. seq.;* 2 *Starkie on Ev., Deed,* 474, 484.)

If the precise date of the delivery could not be ascertained, the defendants should have shown it in their hands before the ten days had expired, or on or before the 21st day of December, 1861. (*Laws* 1851, *p.* 233, § 11; 4 *Pick.*, 519; 1 *Harr. and John.*, 338; 14 *Peters*, 326; 3 *Metcalf*, 109; 1 *Johnson's Cases*, 114.)

The answer of the defendants says in a general way: "That immediately on his receiving notice, the said Bennett filed his three several bonds" "in the office of the secretary of state," "for the faithful performance of his said bid, which said bonds were duly approved." This portion of the answer is "*not full and certain*," and does not "disclose a *fair legal reason* why the mandate of the writ should not be obeyed." (*Section* 10, *Pickering*, *R.* 67)

It is rather *empty* and *uncertain*, and discloses *no reason*, legal or fraudulent, why the writ should not be obeyed.

The presumptions of law are to be taken most strongly against the pleader. Hence, the defendants having failed to disclose a *legal reason*, why the writ should not be obeyed, the presumption is that they had none. *Quod non-apparet non. est.*—That which does not appear must be taken in law as if it were not." (*Broom's Legal Maxims*, 136; 14 *Ohio*, 252; 1 *Hill*, 71.)

The duties of ministerial offices are such as give the officer no power to judge of the sufficiency or validity of any act done or to be done. He is simply required to obey the *mandates of the law*, and *his superiors in office*. (*Vose vs. Deane*, 7 *Mass.* 280; 2 *Bouvier's Law Dict.*, 259, *Tit. Officer*, 6, 3; *Savacool vs. Boughton*, 5 *Wend.*, 170; *Coan vs. Cogdon*, 12 *Wend.*, 496; *Lewis vs. Valmer*, 6 *Wend.*, 367; *Dominie vs. Eacker*, 3 *Barr.*, 19; 20 *Pickering*, 497.)

II. The secretary of state in approving bonds and passing upon the sufficiency and validity of the sureties, "acts judicially."

The judicial duties of an official can not be performed by a *deputy or clerk.* (1 *Bouvier's Law Dict.*, 409, [2, 3, 4]; 2

State of Kansas *ex. rel.* Ross *v.* Robinson and others.

*Bouvier's Law Dict.*, 259, *Tit. Office*, [6]; 7 *Bacon's Abr. Tit. Offices and Officers*, "*L*" 317; *Darling vs. Gill, Wright* 70; 6 *Mod. Reports*, 87; *State of New York vs. City of Buffalo*, 2 *Hill*, 434; 5 *Coming's Dig., Tit. Officer, D* 2; *Wilson vs. The Mayor of New York*, 1 *Denio*, 599; *Harman vs. Brotherson*, 1 *Denio*, 540; *The People vs. Collins*, 7 *Johnson*, 552; 10 *Wisconsin* 533.)

The indorsement of Weir upon Bennett's bond, approving the same on the 23d of December, 1861, was a *judicial act;* and being performed by Weir, in the name of Robinson, and having never been ratified by Robinson, the alleged approval *is therefore void.* (1 *Johnson's Cases*, 114.)

(The authorities relied upon to sustain this proposition are the same as above.) (10 *Wisconsin*, 533.)

Bennett not having filed his bond within ten days after the 11th of December, nor even having executed it, *he must be deemed as having refused to serve the state, in the capacity of a printer.* (*State vs. Hopkins*, 10 *Ohio S.* 509.)

The opinion of the court is short, and we give it entire :

"The county commissioners are expressly authorized by statute to appoint a county treasurer, whenever that office shall become vacant 'by death, resignation, removal, neglect to give bond, or from any other cause.' (*Swan's Statutes*, 1017.) It is further provided by statute, (*O. L.* 56, *p.* 105,) that if the treasurer elect 'shall fail to give bond and take the oath of office as prescribed by law, on or before the first Monday of September next after his election, the office shall become vacant, and shall be filled as provided by law.'

"By reason of the death of Mathias Rapp, prior to the commencement of the term for which he had been elected, there was no person on the first Monday of September, 1860, entitled to take and hold the office during the regular statutory term, commencing on that day. And this want of a regular incumbent for the term, occasioned by the death of a party who would otherwise have been such, constitute, we

think, a vacancy occasioned by death, within the meaning of the statute. And, were it necessary, we should hold that, under the statute last cited, the office became vacant upon the failure of Rapp to give bond and take the oath of office. True, this failure was caused by the act of God, and not by the laches of the party, but its effect upon the office is the same, whatever may have been its cause.

"Demurrer sustained." (6 *Wharton, Penn.*, 481.)

(*Skellinger vs. Yendes*, 12 *Wend.*, 306.) Skellinger sued Yendes, and his sureties, on a constable's bond, for not returning an execution put into his hands for collection, obtained judgment, and defendant appealed to common pleas. On the trial in that court, plaintiff produced the bond on which no approval of the sureties was indorsed. Defendant objected that the bond was not a valid instrument, and plaintiff was nonsuited.

(*Savage, C. J., p.* 307.) "If the bond was not approved and filed, the omission might be considered a refusal to serve, and the vacancy might be filled."

The relator Ross shows that Bennett's bond was not actually delivered over to the custody of the state officers until the 24th day of March, 1862, when it was filed in the office of the secretary of state. It is alleged in the answer, that Bennett filed his bond, but as the precise time is not alleged, the law will intend that it was done on the day stated by the relator, (viz.: on 24th March, 1862.) (*Gorgas vs. Blackburn, et al.*, 14 *Ohio*, 252; *Ferris vs. North American Fire Ins. Co.*, 1 *Hill*, 73.)

The answer of the respondents is defective, because it does not respond to all the allegations in the writ, or in other words, does not cover the whole ground assumed by the plaintiff.

It is evasive, and on that ground bad on demurrer.

It is bad, too, because applying to it the rules of pleading, by which it must be governed, it admits all that is alledged by the plaintiff. Every plea must be construed most strongly

against the pleader, and every allegation not traversed is held to be admitted. Applying these rules, this is the case before the court.

(*Gorgas vs. Blackburn, et al.*, 14 *Ohio, p.* 256; *Wood, C. J.*) "On an application of the town of Massillion, the act of incorporation was repealed by the legislature. But the debt of the plaintiff, Gorgas, on which his judgment was obtained, existed against the town as a valid debt, before the repeal of the charter, and the repealing act contains this proviso: .

" 'That the officers of said town shall have power, by their corporate name, to sue and be sued, and to levy and collect taxes, necessary to discharge the present liabilities of said town, &c., and that all rights acquired, and liabilities incurred by virtue of said act, shall remain valid in all respects.'

"The repeal of the charter, therefore, did not discharge the officers of the corporation from the duties of collecting the debts due the town, and paying off the liabilities it had incurred. It was the duty of the then officers of the town to provide for the payment of its debts—those in office when the charter was repealed—and they are continued as such officers by the act for that purpose. No fraudulent resignation will absolve them from the discharge of the duties imposed, for the statute makes no provision for successors or any other persons than the then officers, to levy taxes or pay the debts of the corporation.

"What, then, is the answer? That, when the writ was served, they were not officers—they had resigned. When did they resign? Was it before the repealing act fixed their duties? The answer does not state, and in this respect is clearly defective; for the rule is, that every plea must have convenient certainty of time, place, and persons; and must be construed most strongly against the pleader.

"It is admitted by the answer, that the respondents were officers of the corporation; and, as the time of their resigna-

tion is not averred in the plea to be before, the law will intend it was after the repeal, and their duties fixed."

Demurrer sustained.

"The conditions and qualities of a plea," says Sir William Blackstone, "are, first. That it be single and contain only one matter; for duplicity begets confusion. Second. That it be direct and positive, and not argumentative. Third. That it have convenient certainty of time, place and persons. Fourth. That it answer the plaintiff's allegation in every material point. Fifth. That it be so pleaded as to be capable of trial."

Every plea must be simple, entire, connected, and confined to one single point; it must never be confounded with a variety of distinct, independent answers to the same matter, which must require as many different replies, and introduce a multitude of issues upon one and the same dispute. (*Blackstone's Com. Vol.* 3, *p.* 311.)

"At common law it was a general rule equally affecting declarations, pleas, replications, &c., that the pleading must not be *double;* that is, that no single count or plea should state two or more facts, either of which would, of itself, independently of the other, constitute a sufficient ground of action or defense; a rule founded on the principle that it would be unnecessary and vexatious to put the opposite party to litigate and prove two points, when one would be sufficient to establish the matter in issue." (*Chitty's Pleading, Vol.* 1, *p.* 230.)

The defendants were bound to negative every allegation of the relator, specifically and directly, and to set out the facts, in their answer, which constitute the negative ground maintained by them, and if any fact set up be inconsistent with other facts alledged, it renders the answer void. The answer must be taken as an entirety, like a count in a declaration. If the answer be defective in part, it renders the whole bad.

The following references contain cases in point:

(*Ten Eyck vs. Waterbury,* 7 *Cowan* 51.) "Savage, C. J. A plea bad in part is bad in the whole."

State of Kansas *ex. rel.* Ross *v.* Robinson and others.

(*The People vs. The Judges of New York*, 1 *Wend.*, 39.) Savage, C. J. * * * "The whole return is to be considered as an entirety, like a count in a declaration. If the facts set forth cannot be traversed or denied, the relator may demur."

(*The Commercial Bank of Albany vs. The Canal Commissioners of New York*, 10 *Wend.*, 26.) Walworth, chancellor. "The return to the alternative madamus in this case is objectionable in form at least, in not charging facts positively and distinctly; in this respect it is very informal and defective. Instead of stating facts, the return merely sets out or refers to matters of evidence from which those facts are inferred. This is contrary to every principle of good pleading. If the writ in this case had shown a valid title in the relators, I should think the demurrer to the return well taken."

(6 *Bacon's Abr.*, 447, *Tit. Mandamus*, [*I.*]) "As every *mandamus* issues upon a supposal of some breach and disobedience of the law, or neglect of duty in the person to whom it is directed, the return thereto must be certain in every respect; and therefore it is said not to be sufficient to offer such matter as the party may falsify in an action, but also such matter must be alledged, that the court may be able to judge of it, and determine whether the party's conduct be agreeable to law or not.

"In point of form, it (return) requires the same certainty and precision necessary in declarations and other pleadings." (*Brosius vs. Reuter*, 1 *Har. & J.*, 551; 6 *Bacon's Abr.*, 447, *Tit. Mandamus*, [*I.*])

Certainty, to a general extent, is requisite in an answer, yet it must contain a full and fair answer to all the averments made in the petition, and show a fair legal reason for disobeying the mandamus.

(6 *Bacon's Abr.*, 447, *Tit. Mandamus*, [*I.*]) "To a mandamus to admit an alderman, the party may return that he was not qualified, or that he was not elected; also, several causes

may be returned, but they must be consistent; and therefore if the return admits a good election and afterwards avoid it by matter repugnant, this is naught."

The same. "Where several causes returned to a mandamus are inconsistent, the whole must be quashed, because the court cannot know which to believe, and it is an objection to the whole return. It is like a declaration in which two inconsistent counts are joined; then the plaintiff cannot have judgment."

(*Commercial Bank of Albany vs. Canal Commissioners*, 1 *Wend.*, 25.) "If he, (defendant) makes a return, he must either deny the facts stated in the writ, on which the claims of the relator is founded, or must state other facts sufficient in law to defeat the relator's claim." (*Rex vs. Corporation of Dublin, Batty's Rep.*, 268; 18 *California* 82, *Mandamus;* 2 *Indiana*, 332.)

A general denial of the facts stated in the relator's petition, and setting up new matter in bar, in the return in the same case of defense, is certainly inconsistent, therefore the answer is bad, upon the ground assigned in the fourteenth cause of demurrer.

The answer of the defendants, after reciting the notice of November, says:

"That various bids were received, among which was the bid of the said E. G. Ross, and one J. H. Bennett. That the bid of the said J. H. Bennett was some one hundred per cent. lower than the bid of E. G. Ross, and he, the said J. H. Bennett, being the lowest and best bidder therefor, was notified, in accordance with the law, of that fact. That immediately on his receiving notice, the said Bennett filed his three several bonds, with good and sufficient sureties, a copy of which is hereunto attached, marked exhibits 'C,' 'D,' and 'E,' in the office of the secretary of state of the state of Kansas, for the faithful performance of his said bid, which said bonds were duly approved."

State of Kansas *ex. rel,* Ross *v.* Robinson and others.

(*The State ex. rel., C. W. Bently vs. Commissioners, et. seq.,* 7 *Wend.,* 477.) Nelson, J. " He, therefore, cannot look beyond the return to the affidavits for the purpose of varying the legal effect of it. It may be proper that the original papers should be before the court upon the hearing of the return to the alternative writ, for the purpose of advising the court of the purport and intent of the proceedings, but not to affect the facts contained in the return, and this is all, as I understand it, that is meant by the cases to which I have been referred."

Then it is to the return that the court is to look. The exhibits are no part of the answer.

The answer says, "various bids were received, among which was the bid of E. G. Ross, and one J. H. Bennett," and yet does not give the bid of Bennett. It does not say when the bid was filed. "Bennett's bid was some hundred per cent. lower than the bid of Ross." Still, Bennett's bid does not appear; but the court is left to infer that Bennett offered to do the printing for nothing. * * * "The said Bennett being the lowest and best bidder therefor," and still, from beginning to end, the answer does not say for what printing Bennett bid, whether for any one or all of the seven proposals contained in the notice.

"Bennett was notified, in accordance with law, of that fact," viz.: that his bid was a hundred per cent. lower than the bid of Ross. "That immediately on his receiving said notice, the said Bennett filed his three several bonds with good and sufficient sureties." Yet does not say when the bonds were filed, for what they were given, or to whom they were made payable, * * "which said bonds were duly approved." This is a conclusion which should have been left for the court to have drawn, after the approval itself and the authority of the officer approving, had been clearly and definitely shown. (*See* 1 *Chitty,* 5, 19.)

The courts will not presume possible nor indeed probable facts which do not appear, for the purpose of making a return valid.

The statements of the relator stand without being questioned, either directly or indirectly, in a legal manner. The writ shows clearly and conclusively that Bennnett, on the 11th of December, 1861, had notice of the award of the state printing mentioned in the said proposal number four, and that he did not execute his bond for the faithful performance thereof, until the 23d of December, 1861. Ross shows that he bid for the printing mentioned in the same proposal, and that he was the next lowest bidder therefor,

The law says, (*Laws of Kansas*, 1861, *p.* 233, § 11,) "and if he" (Bennett, in this instance) "shall fail so to give bond within the time allowed" (ten days after receiving notice of the award) "the contract shall be given to the next lowest bidder who will give bond as aforesaid."

Ross unquestionably was entitled to the award of the contract for the said state printing, as per proposal number four, on the 22d day of December, 1861, and his right to it certainly became a vested one then. And Bennett, failing to have his bond approved and filed, within those ten days, must, in law, be deemed as having refused to perform the work. They cannot now rely upon Bennett's bond, as a defense, he having suffered laches for two days.

"*Vigilantibus, non dormientibus, jura subveniunt.*" The law assist those who are vigilant, not those who sleep over their rights. (*Broom's Legal Maxims*, 551.)

III. A written contract entered into between two parties, founded upon a considertation releases a prior contract, by the same parties, when executed for the performance of the same work, whether the compensation under the latter was to be greater or less than that under the former.

That portion of the answer which sets up new matter in bar, says:

State of Kansas *ex. rel.* Ross *v.* Robinson and others.

"That the printing committee took such action as to cause the said Bennett to amend his said bid, by deducting from the original some amount, but the precise amount is to these defendants now unknown. A copy of which amended bid is hereto attached, marked exhibit 'A.'"

It says that on the 5th of March, 1862, Bennett presented and exhibited to the printing committee his amended bid, and on the same day the legislature passed concurrent resolution number nineteen, which authorized and empowered the defendants to complete the contract with Bennett, for that portion of the public printing awarded to him, which printing was the same as Ross bid for ; and that on the 21st of March, defendants and Bennett entered into three several contracts, marked exhibits "F," "G" and "H," "for the printing, binding, folding and stitching of the public documents as aforesaid," and that said contracts were filed on the 24th of March, 1862, in the office of the secretary of state.

The amended bid itself, the indorsement of the printing committee, the agreement between Bennett and the board, made on the 21st of March, 1862, the filing of the same on the 24th of March, 1862, and the for once candid averments of the answer, incontestibly prove that Bennett intended to abandon his first contract ; that the board released him from its obligation, and that old things should be done away entirely. Nay, more, they prove that they did do away with the entire batch of old contracts made in December, 1861.

They relied upon a copy of concurrent resolution number nineteen, which Bennett carried in his pocket for a month, for power to make new contracts with Bennett, in order that the laches of two days might be healed.

The latter contract, entered into between Bennett and the board on the 21st of March, 1862, operated as a release or abandonment of the prior contract between them in December, 1861 ; both being executed for the performance of the same work. (*Broom's Legal Maxims,* 550 : *Lattimore et. al., vs.*

14

*Harson,* 14 *Johnson,* 330; *Dearbon vs. Cross & Thrasher,* 7 *Cowen,* 48.)

This is a case in point, in which the case of Lattimore, *et. al., vs.* Harson, is commented upon and affirmed. (*Gillett vs. Maynard,* 5 *Johnson,* 87.)

If contracts under seal can be released or rescinded by parol, whether executed or executory, certainly a contract can be released or rescinded in the more binding and solemn form, viz.: under seal. (2 *Johnson R.,* 214.)

The contract entered into between Bennett and the board, on the 21st of March, 1861, being under seal, was the most solemn revocation of the previous contract made on the 23d of December, 1861, known to the law. (*Broom's Legal Maxims,* 543.)

IV. Upon the assumption that Bennett's first contract was valid, if that was rescinded or released under seal, and, under the direction of the legislature, a new contract was made, contrary to the constitution of Kansas and the "act to provide for the state printing," approved May 15th, 1861, it cannot be set up as a defense in this suit.

Bennett's amended bid, (*see exhibit "A,"*) as presented to the committee on the 5th of March, 1862, in pursuance of the action of said committee, the passing of concurrent resolution number nineteen, by the legislature, on the same day, authorizing the board to complete the contract with Bennett, upon terms agreed upon by him with the committee, and the agreement entered into on the 21st of March, 1862, between Bennett and the board, show,

First. That no notice whatever was given by the board. Second. That Bennett's amended bid was not "sealed," indorsed "proposals for the state printing," and "filed in the office of the secretary of state." Third. That the award was not made to Bennett as the lowest and best bidder, or that Robinson, Hillyer and Dutton, made the award. Fourth. That Bennett did not give bond within ten days after receiving notice of the award.

A more wide departure from the spirit and letter of the law, and even the constitution itself, seldom occurs. We look in vain for a single compliance with either of them, through this "amended" transaction. (*Constitution of Kansas, Art.* 15, § 4; *Laws of Kansas,* 1861, *pp.* 229, 230, 231, 237.)

These defendants, having participated in these transactions, ought not to be permitted to set up their illegal acts to defeat a just claim. (*Broom's Legal Maxims,* 576.)

And certainly the rights of the relator, when vested, ought not to be prejudiced by the errors of the printing committee or improvident legislation. (*Broom's Legal Maxims,* 583.)

V. There is no evidence that Bennett made a bid in November, 1861; that he amended his bid in March, 1862; that he filed a bond before the 24th of March, 1862, or that the legislature ever passed concurrent resolution number nineteen. (*Laws of Kansas,* 1861, *p.* 210, § 12, "*Fifth*"; 10 *Wend.;* 26.)

The amended bid is not competent evidence as referred to in exhibit "A." There being no evidence, either in the answer or on the exhibit, "that the chief clerk of the house of representatives, at the close of the last session of the legislature," deposited it "in the office of the secretary of state," as one of the "documents" or "papers" coming from and belonging to the legislature. It not being the original, nor being a certified copy, by the secretary of state, under the great seal of the state, renders it incompetent, also. (*Laws of Kansas,* 1861, *p.* 211, § 15; *Laws of Kansas,* 1861, *p.* 210, § 12, "*Fifth.*").

Concurrent resolution number nineteen, (exhibit "B,") is not competent evidence of the existence, passage, or publication of such. The exhibit shows it to be only "a copy," and certified thus by the officers of both branches of the legislature. To have the force of law, it should have been published. (*Const. of Kansas, Art.* 2, § 19.)

There is no evidence of its publication; the exhibit not being thus certified by the secretary of state, under the great seal of the state, nor published in the statutes.

There is no evidence upon the journals of the senate and house of representatives of the passage of said resolution.

It is proper for the court to look into the records of the two houses of the legislature, in order to ascertain whether a bill or a resolution passed in a constitutional manner. (*Warner vs. Berse*, 23 *Wend.* 126; *Purdy vs. The People*, 4 *Hill*, 384, 391; *The People vs. Purdy*, 1 *Denio*, 31; 14 *Ill.*, 297; 19 *Ill.*, 324; 1 *Greenleaf Ev.*, § 491.)

VI. The bid of Ross, having been offered in pursuance of a notice of the board, and having been received and properly passed upon by them, became a contract, whose obligation was binding upon both parties, upon the failure of Bennett to file his bond, the impairing of which obligation, either by the action of the board or legislature, is unconstitutional.

The constitution of the United States, (*Art.* 1, § 10, 1,) provides that "no state shall pass" * * "any law impairing the obligation of contracts."

The effect of concurrent resolution number nineteen upon the contract of Ross is to take away every vestige of his right.

If the "impairing of the obligations of contracts" be unconstitutional, how much more palpably unjust is that act which wholly annihilates that obligation.

In the case of Ogden *vs.* Saunders, (12 *Wheaton*, 350,) chief justice Marshall said:

"The obligation to perform is coeval with the undertaking to perform; it originates with the contract itself, and operates anterior to the time of performance." (*Danks vs. Quackenbush*, 1 *Comstock*, 133, *Gardner, J.*; 3 *Story's Com. Con.* § 1379.)

The same rule is laid down in the case of Morse *vs.* Goold, (1 *Kernan*, 281. *Sturgis vs. Crowninshield*, 4 *Wheaton*, 107; *Ogden vs. Saunders*, 12 *Wheaton*, 287; *Bronson vs. Kinzie et al.*, 1 *Howard U. S.* 311; *McCracken vs. Hayward* 2 *Howard U. S.* 608; *Gantley's Lessee vs. Ewing*, 3 *Howard U. S.* 716; *Howard vs. Bugbee*, 24 *Howard U. S.* 461;

*Flethcher vs. Peck, Fed. Const.* 134; *Oyden vs. Saunders, Fed. Const.* 630.)

Hence it is that the most learned judges of our country have been exceedingly scrupulous in guarding the rights which persons acquire by contract from the craft of office, the hazard of legislation, and the lust of power, by declaring every law unconstitutional which impairs the obligations of contracts entered into prior to their passage, in manner, degree, construction, or in the mode of discharge.

If concurrent resolution number nineteen was passed in a constitutional manner, (and we think we have shown it was not,) it is unquestionably unconstitutional in its operation.

The power of the legislature to override the constitution and the laws of the state, by resolution, ought to be viewed with much suspicion, when exercised for the purpose of annihilating the obligation of contracts.

The said proposal number four, contained in the notice of the board, published in November, 1861, called for "the printing of the general and local laws, and such joint resolutions as may be directed by the legislature to be printed therewith." The return of the defendant nowhere shows that Bennett has been awarded the contract for printing the same, or that he has been furnished the "copies of the general and local laws, and such joint resolutions as may be directed by the legislature to be printed therewith."

Bennett was the successful bidder for other portions of the state printing. Copies for such printing may have been given him, and by such a subterfuge as saying all copies, papers and documents have been placed in the hands of Bennett, the answer seeks to engraft an idea that can be drawn from it only by substituting ideas for facts, suppositions for axioms, and vagary for the rigid certainties of law—and by meditated uncertainty, wrest from the relator that to which he has shown an incontestible right.

The defendants either have the copies of "the general and local laws and such joint resolutions as" were ordered by the

legislature to be printed with them, in their possession, or they have not; and not having said whether they have or have not, the reasonable presumption is that they still have this copy. (14 *Ohio*, 252; 1 *Hill*, 73.)

Furnishing copy of the journals of the two houses, "and of such reports, communications and other documents," as per proposal number three, ought not by intendment, to be made to include copy for the printing mentioned in proposal number four.

And unless the return specifically and certainly says what copies have been placed in the hands of Bennett, the law will not infer that it was either one or the other, or both; on the contrary, if there be anything in analogy and precedent, it will infer nothing, when nothing is proven; but judge the return bad for duplicity, and award the peremptory writ.

*Case & Case,* for respondents.

The supreme court "alone, and not one of the justices, are authorized to grant the writ of mandamus." (*Constitution, Art.* 3, § 3, "*Supreme Court,*" defined, *Art.* 3, § 2.)

In the absence of statutory provisions, justices of this court cannot, at chambers, grant the writ. (*Art.* 3, § 16.) The "supreme court" may issue any writ, not prohibited by statute. (*Laws* 1861, *p.* 119, § 1.) But the justices, in vacation, are confined to the issuance of writs of error, and *certiorari* in criminal cases. *Habeas corpus* and *supersedeas* in any case. (§ 1.)

And suppose the granting of the writ by the justices at chambers, in vacation, to be good, courts will not enforce, by mandamus, such a fraudulent contract. (33 *Barbour R.*, 511, 517.)

Statement of propositions:

Ross.—Composition per one thousand ems, two dollars.

Bennett.—Composition per one thousand ems, one dollar. Difference, one hundred per cent.

Ross.—Press work, per quire, twenty-five cents; per token, two dollars and a half.

Bennett.—Pres work, per quire, ten cents; per token, one dollar. Difference, one hundred and fifty per cent.

Ross.—Paper, per quire, one dollar.

Bennett.—Paper, per quire, fifty cents. Difference, one hundred per cent.

A token is composed of ten quires, and the bid of Ross some one hundred and ten per cent. higher than Bennett's. When the bid would be such as to defraud the state, the board may use discretion and not perform, and mandamus will not lie to compel the board to fill such contract. (33 *Barbour,* 511.)

Bennett performed all the duties incumbent upon him under the act of 1861, section eleven, by entering into bonds within the ten days prescribed by the act, which were not necessary, under the act, to be approved by all the state officers, and it was not necessary, under the law, to file them at all; yet they were approved and filed within the ten days. The act says they shall be *entered into* within ten days. They may be filed at any time after they are received by the board. If they were not as yet filed, it would not vitiate the contract. The neglect of the officers to perform any duty required of them by law could not effect Bennett.

The last part of section eleven is what the relator relies on to compel the board to give him the contract, which says: "If he shall fail so to give bond within the time allowed, then the contract shall be given to the next lowest bidder." This the relator contends is imperative, and the board *must* and *shall* give the contract to the *next lowest* bidder, however high the rates, or however fraudulent the contract.

If this were the case, a combination might be formed, by which the state would be made bankrupt in one year.

This construction would leave the officers no discretion whatever, and the state at the mercy of the printers.

Such, clearly, was not the intention of the legislature, but that contracts should be let to the lowest responsible bidder, the officers to be the judges of the responsibility, (*see last part of section* 2,) if no "satisfactory assuarance" was filed with the bid. In this case no such assurance was filed by the relator, and even had Ross been the lowest instead of a higher bidder, the officers would have been justifiable in giving the work to the other parties. (*Ib.*)

Then what do the words, "who will give bonds as aforesaid," mean? If the construction of the relator is correct, that the next highest bidder should, within ten days after he was *notified*, enter into bonds to the state, or should, within ten days after the *failure* of the first and successful bidder to give bonds, himself enter into bonds. Either construction is fatal to the relator.

I. He has never been notified.

II. He did not enter into bonds until the 22d day of March, A. D. 1862, long after the first ten or twenty days expired. But the word "shall," in the last part of section eleven, is of the same import, and signifies no more or less than the word "may." The act being directory merely, the only proper and reasonable way in which the act can be construed, is to read it thus: "If he shall fail so to give bond within the time allowed, then this contract *may* be given to the next owest bidder, who will give bond as aforesaid;" leaving the officers the right, even after the expiration of the ten days, to yet take bonds of the "successful" and lowest bidder, so that the state may not be defrauded, and her work be done at the lowest rates.

A mandamus will not be issued on the application of an individual to any officer of the government, commanding him to make a contract binding on the state. (13 *Wend., p.* 438; 11 *How.*, 272. *See, also, The People vs. Cook,* 14 *Wend., p.* 259,) as to the rule of construction of the ten day clause in the statute.

State of Kansas *ex. rel.* Ross *v.* Robinson and others.

By the Court, EWING, C. J.   We shall treat this as a motion addressed to this court, in the first instance, under the provisions of the code, and will consider only the motion and affidavit, and such portions of the briefs as relate to questions arising on the facts set forth in those papers.

If Bennett, by failing to execute or deliver his bond as required by law, lost all right to the contract, and if all the facts stated in the motion and affidavit be true, were the state officers required by the law unconditionally to let the contract under the fourth proposal to the relator ?

We think they were not.

First. Because relator did not propose to do all the work, named in the fourth proposal, and required by law to be let in one contract.

Section third of the "act to provide for the state printing," of May 15th, 1861, provides "that the printing of all bills for the two houses of the legislature, together with such resolutions and other matter as may be ordered by the two houses, or either of them, to be printed in bill form, shall be let in one contract.   *   *   *   *   *   The printing of the general and local laws and such joint resolutions as may be directed by the legislature to be printed therewith, shall be let in another separate contract."

Proposal number four, published and signed by defendants, ꞩ as follows :

" For the printing of the general and local laws, and such joint resolutions as may be directed by the legislature to be printed therewith, the price per thousand ems for the composition, and the price per quire of the paper ; the laws to be printed in royal octavo form, on good small pica type, the pages to be of the same size and form as those in the laws of the territorial legislature of 1860, with similar marginal notes and index to the same."

The bid filed by the relator is as follows :

"TOPEKA, December 9th, 1861.

"I propose to print the general and local laws for the second session of the legislature, as follows, per proposal number four: Composition, per one thousand ems, two dollars; press work per quire, twenty-five cents; paper, one dollar.

"E. G. ROSS."

It will be seen that the law imperatively requires that three classes of matter should be let in one contract—the general laws, the local laws, and such joint resolutions as the legislature might require to be printed with the laws. Proposal number four called for bids for that one contract for printing those three classes of matter, and prescribed the manner in which the work should be executed. Ross bid for printing the general and local laws, omitting mention of the joint resolution. We think the words, "per proposal number four," can only be construed as relating to the manner of executing the work, as set forth in the proposal, and not as including a class of matter distinct from the two classes expressly named in the bid.

Defendants were not required to regard an equivocal bid, which, when accepted, would not plainly bind the bidder to do all the work named in the proposal. Could the state, had Ross' bid been accepted, have recovered damages on the proposal and the bid, had he refused, to its injury, to print the joint resolutions? We think not; and we think the state officers were at liberty, if not bound, to disregard the bid, as not responsive to the proposal, even had it been the most favorable, to the state, of the bids presented.

Second. Because the law imposed on the state officers, in determining which bid should be accepted, a discretion which the courts have no power to control.

Section second of the act aforesaid, provides that "the said secretary, auditor and treasurer shall, in no case whatever, receive or take into consideration the bid of an irresponsible person; *provided*, however, no person shall be deemed

irresponsible who shall tender to the executive officers, afore-said, along with his bid, satisfactory assurance, subscribed by his proposed security, that he will execute the bonds required by the eleventh section of this act."

Section eleven of the same act provides that if the person whose bid shall have been excepted, shall not give the bond within ten days after such acceptance, "then the contract shall be given to the next lowest bidder, who will give bond, as aforesaid."

It cannot, with good reason, be claimed that a bid which defendants were forbidden to receive and consider, as coming from an irresponsible person, or as not satisfactorily assured, at the first letting, should be regarded as the next lowest bid, after the first bidder failed. To ascertain who was the next lowest bidder, therefore, resort could only be had to those bids which they were authorized, in the first instance, to receive and take into consideration.

And what bids were *they?*

Why, only the bids of those persons who were responsible, or who filed with their bid satisfactory assurance, signed by proposed securities. And whose duty was it to determine whether a bidder was responsible, or his proposed securities satisfactory? It was the duty of defendants to determine, and on their own judgment.

The relator filed his bid, but it does not appear that defendants took it into consideration at the letting, and the writ of mandamus is asked because they failed to do so. After-wards, when Bennett—who was the successful bidder at the letting—neglected to give bond within the time prescribed, we cannot command them to let the contract to the relator, because the bid *may* be one which the law forbade them to take into consideration, and whether it is such a bid depends on the result of the exercise of *their* judgment and discretion; not ours. The principle is familiar and unquestioned, and is

illustrated by so many authorities that it were superfluous to cite cases in support of it that mandamus will not lie to compel a public officer to do an official act, unless the act be ministerial and not discretionary.

Motion overruled.